Number 161661, John Hancock Life Insurance Company et al. v. Abbott Laboratories. Thank you. Next. Good morning. I would like to reserve two minutes for rebuttal please. Yes. My name is Joan Lukey, with me John Natus and Kevin Finnerty for the Hancock entities. As the court knows, this is a case in which the district court found that material misrepresentations had been made by the defendant that Hancock had relied upon in entering into an investment agreement relating to pharmaceutical research, but the district court on the basis of several rulings of law declined to allow any remedy whatsoever to Hancock for those material misrepresentations. We find that and suggest to the court in our brief and here that that is especially difficult to accept given that there is an express provision in the contract section 3.3b, which deals precisely with the circumstance of Abbott's failure, found by the court, to spend the aggregate spending target within the program period. That means the key issue on appeal, although there are certainly others and we do rely on the other arguments in our brief, is whether the district court was entitled to rewrite what the court called the plain language of section 3.3b, a provision the court found to be unambiguous by adding an implied term. The implied term which the court added was that Hancock would have been required to make all four of its program payments in order to avail itself of the remedy in 3.3b, in order to ensure that the spending ratio of Abbott to Hancock remained at 65%, 35%. I would ask this court to look at footnote 4 in this court's different panel. If we're setting the table for this argument, I think you've left out half of the issue because although the district court did hold that there was an implied further term to 3.3b, the court then went on and made an alternative holding that even if there was no implied term, that 3.3b was unenforceable as a penalty. So I think you've got to deal with both of those arguments. I intend to, Your Honor. I was going to take them sequentially. I was going to ask the court to note that footnote 4 in the First Circuit's opinion in what has been referred to as Hancock 2, that is the affirmance of the earlier case before the court, different panel, not law of the case. We understand it arose under different provisions, expressly provides that, quote, the contract never required Hancock to spend half as much as Abbott, close quote, and expressly rejected Abbott's 2 to 1 ratio. So the implied condition that Judge Woodlock suggested was necessary here was rejected by this court in an earlier decision even though because it is a separate case under a separate provision, it isn't binding as law of the case. It is certainly instructive. It is the position of Hancock that there is nothing in this contract, just as footnote 4 noted, that suggests that there was intent to have a 2 to 1 spending ratio implied into the entire contract. There is such a condition in Section 3.4, the next provision, the one that was at issue in Hancock 1, but it is noticeably absent from 3.3 and particularly 3.3b. Hence, we suggest to this court with unambiguous language in a contract between two highly sophisticated parties with more than 40 drafts, the record reflects, over negotiations of more than a year in which the parties omitted any suggestion that there had to be a spending ratio in order for the remedy of 3.3b to be available to Hancock is simply inappropriate. It is contrary to the law of the state of Illinois and Illinois law governs. So we come to this court, yes, talking about rescission as well, but first and foremost with the argument that there was no basis, no basis whatsoever for the court to decline to award to Hancock its express remedy under 3.3b in the circumstances of this case. And 3.3b says that if Abbott does not spend the aggregate carryover amount, this is an underspending provision, on the cost during the period of the contract, the four-year period or the subsequent year, quote, Abbott will pay to John Hancock one-third of the aggregate carryover amount that remains unspent by Abbott, close quote. That aggregate carryover amount was $99.1 million, 30% is roughly $33 million, and that amount on the face of the contract is due to Hancock. Now let me turn to Judge Selya's question. It is the case that Judge Woodlock then said that this should be considered an unenforceable penalty clause. However, under Illinois law, a section such as 3.3b operates either as an enforceable alternative performance provision or as a liquidated damages clause. This is a case where the acknowledged victim, if you will, is Hancock. There were three material misrepresentations made as to three of the nine and one of those would likely have resulted in Hancock not entering into the contract and paying the first $104 million, which it did pay, before it was expressly excused from paying the remaining two payments. So this is a circumstance where the parties have agreed that if Abbott, which controlled all of the money, once Hancock turned over its money, it had zero control, zero ability to influence how the spending was done. If Abbott then didn't spend what it agreed to spend, the agreed upon alternative performance for Abbott was not that it was going to have to spend the $99 million that was still contractually obligated to spend, but rather that it could elect not to spend the balance, which is what it did, not to spend the entire so-called aggregate spending target of $614 million. Would the same result obtain if the misrepresentations had been discovered before any money was advanced by Hancock? Your Honor, if it had become apparent that the misrepresentations had occurred and Hancock had chosen at that point to exercise its right not to make the program payments, the answer is yes. And then I understand, this is what Judge Woodlock argued as well, but that wouldn't be fair because Hancock would have put no money in and would have realized a windfall. But if we're going to talk about what is fair, we should be looking at the actual facts of this case in which Hancock, the innocent victim, paid in more than $100 million, looks then to the contract provision that would allow it to recover or recoup at least in part, and would end up if the $33 million is paid, as the contract clearly requires under its face, Hancock still at the end of the day has a net $56 million loss. So if we're going to talk about should we look at a hypothetical scenario in which Hancock might realize a windfall, and is that fair, then we have to look at the fairness of what actually happened, which I would suggest should weigh materially more heavily than a hypothetical scenario. And what we would then find is that Hancock still ends up with a net loss of $56 million. Hence, we suggest that in the case of where there hadn't been any outlay in the first instance, would you still be arguing that, on your view, it's a liquidated damages provision, that the lost opportunities are what are encompassed in that? Yes. I mean, we're looking at a situation. This isn't a situation with uneven powers of the parties or abilities. I won't even imagine the scenario of how many lawyers and law firms may have been involved over a year's worth of negotiations, but you had two highly sophisticated parties. And while I recognize that Judge Woodlock found that the misrepresentations were not intentional, he also found that the first and foremost of those misrepresentations as to drug ABT-518, the cancer drug, was that in the days preceding the execution of the contract, Abbott put a stop work order on that, which one of the individuals at Hancock involved in the negotiations managed to pull back with an express internal communication that basically said, we dodged a bullet on that one, we got the contract signed, and then permanently stopped the work three months later. Perhaps that was unintentional. It's a little hard to imagine that it was. But in terms of looking at the equities, had Hancock been aware of that two weeks after signing the agreement, that on one of the major compounds, some would say the most major compound under this contract, that Abbott had already decided that it wasn't going to work and was going to stop all efforts in that regard? Would Hancock have had the right two weeks later to say, this isn't a windfall, I was supposed to be making a profit here, and you knew that. There were enormous upsides here. They're not guaranteed, but they were there. And so what would Hancock's remedy be at that point? It's not going to see those upsides, but if it's already put in its $50 million, or let's say it's put in nothing at that point, it's entitled to one-third of what Abbott didn't spend because it got misled into a contract that it clearly would not have entered into. Ms. Lukey, before you move on to the question of when you learned of the misrepresentations vis-à-vis your rescission claim, on the unenforceable penalty, we do have the fact that Hancock could have easily labeled 3.3 as a liquidated damages clause. It obviously didn't. Under Illinois law, that's not dispositive. They've certainly found unlabeled clauses to be liquidated damages. But there's also a body of Illinois and Seventh Circuit law applying Illinois law that says if it's a close question between whether it's an unenforceable penalty or a liquidated damages clause, Illinois law gives the nod to it's an unenforceable penalty. Now, that's something neither side has briefed very much, but I certainly found it in doing research under Illinois law. Would you like to comment? Certainly, Your Honor. First, I would note that the principal argument Hancock made in the brief and that I asserted first here is that that provision, 3.3b, is an alternative damages provision. In other words, you've got a circumstance where the court has already found it's going to be very difficult to prove precise damages because you're talking about lost profits. But it's nonetheless a liquidated damages provision because there's a certain there under the formula. And alternatively, this is why I was explaining why we would not have spent the time on the issue that Your Honor is talking about, because our primary position is it's an alternative performance provision which benefits Abbott and now Abbott wants to escape it because otherwise it would be required to put in the additional $99 million and this gives it a way out by only paying 33 and then walking away. But with regard to liquidated damages, case law in Illinois is extremely clear that the more difficult it is to prove damages, indeed, one of the cases we cite speaks in terms of you just can't quantify damages. Judge Wardlock, I'm sorry, said, well, you didn't prove damages, but it's not because it was impossible for you to prove damages. You just picked an expert who had a theory that in the end didn't make sense. So I don't know that that gets you very far. Well, respectfully, Your Honor, Judge Woodlock also said that the damages in this case were very difficult, if not impossible, to prove. Yes, he did say he could see an avenue to prove, but he actually says, and we quote that line in our brief, that it would be extremely difficult to do so in a new business situation with profits not yet demonstrated. On the rescission question and the issue I raised about when you found out about various misrepresentations, we'll give you a few, a little bit more time to respond. Thank you, since I did not reach that issue at all. There's a 16-month delay pointed out by the court before the amendment was pressed about rescission. First of all, I would point out that while the complaint had been filed alleging fraud and misrepresentation and breach of contract, in this case, Hancock III, rescission was not paid for expressly as a remedy, but it was attempting to get the necessary evidence to make allegations for what is a significant and extraordinary remedy. Rescission is not given lightly. To us, the most important issue here is what Judge Woodlock found on the audit breach. The purpose of the audit was to try to figure out how extensive and serious the conduct had been in the misrepresentations. The judge went on to find they were unintentional, which would not preclude rescission, but Hancock was attempting to determine if they were intentional. The judge finds, covering that same time period, this 2004 to 2005, when Hancock was attempting to audit, that Abbott completely rebuffed the audit attempts, did not provide the information necessary to stone turn the independent auditor, would not provide people who could answer questions to answer questions. The judge found in March of 2005 and said that's it. So that left Hancock, which was trying to act responsibly in not asserting the request for what is an unusual remedy, a more serious remedy than others, in a position where it was being deprived of the evidence necessary to determine whether these misrepresentations were intentional. Eventually it went ahead and moved anyway for the prior year. Thank you. May it please the court, I'm Jeffrey Weinberger, I'm along with Elizabeth Lawton, counsel for defending the Pemberley Abbott Laboratories. Let me first get out of the way the idea that this unfairness that happened here to Hancock, whether that has anything to do, alleged misrepresentations with section 3.3, which is not premised on misrepresentations at all. The reason that Hancock... No, but it's relevant to the question of whether it's an unenforceable penalty. So certainly Ms. Lukey did nothing awry in raising that argument. Yeah, but it doesn't require in any way any misrepresentations on its face. Okay. What do you think 3.3 means? I think 3.3 clearly means that if Abbott fails to pay above and beyond the $214 million that Hancock was to contribute, then the way that clause works, it adjusts back the payments so that they exactly correspond to the $214 to $614 million ratio that was contained in section 3.1. But the clause doesn't say that. I mean, I understand why you would like to imply it. I understand why Judge Woodrock implied it. But it doesn't say that. I think that you have to look at all of the clauses together and understand how they work to come to that. But I'll say this, Judge. The one-third makes absolutely no sense if it applies in any other situation. It's completely arbitrary, and it's penal. And I'd like to explain, because I think that goes to the heart of this, why it is clearly a penalty under Illinois law. But that's a different argument than implying the construction that you wanted. The problem I have with implication is that you've got a deal here negotiated painstakingly between sophisticated parties and high-powered law firms, and it is really difficult to imagine that as important a term as this would simply have been left out and left to implication. The argument that this is a penalty rather than an alternative performance or liquidated damages clause, different argument, may have more strength. I understand. And I understand they're related. But I think that some of the reasons why it's a penalty led the court to conclude that that could not have been the intention of the parties, and then led him to find that it was either implicit conditions. That doesn't mean he's free to imply a term. I understand. All right. So perhaps you could focus on what we've been trying to focus on, which is the alternate ruling. Yes, Your Honor. So the reason that the clause is a penalty in this situation, it's not a penalty if it's applied to a shortfall that's caused by Abbott failing to pay at least $400 million. Because, as I said, it will adjust each time to restore the exact balance and ratio of Abbott to Hancock payments that were originally contemplated. So it's not a penalty in that circumstance. But if you apply it to the situation where Hancock is discharged from port or all of its payments, and then Abbott has to make up that shortfall, then the one-third operates as a penalty for several reasons. So wait a minute. Let me make certain I get the purport of what you're saying. So you're saying that this same clause, 3.3b, can't be looked at as either a penalty or a liquidated damages clause, but it can be one or the other depending upon other circumstances? It's got a kind of mutating character? I think the way the Illinois Courts analyze penalty clauses is that they look at whether it's a penalty as applied to the particular situation in front of it, not as a general proposition. I thought we had to make the determination as of the time that the contract was made, what the parties reasonably could be thought to have intended at the time they entered into the contract. And that's my point, that you could come up with this one-third made perfect sense at the time of contracting, because if it operated in the situation where the shortfall was caused by Abbott and Hancock made his program payments, because that one-third would operate to restore that ratio back to where it was if all the payments had been made. So it's a perfectly rational at-the-time-of-contracting provision for that circumstance. But the circumstance of Hancock causing the shortfall is arbitrary and irrational. Let me try and explain why. But your client could have easily conditioned 3.3 so that it didn't apply where Hancock doesn't meet its four years. Yeah, I mean, I could see that the contract wasn't perfect, and frankly, if it meant that Abbott was to make up the difference in any payments that Hancock was discharged from, it could have easily said that too, and it doesn't. So the contract could have been drafted better on both sides. But I still want to get to this penalty argument, because I don't think that whether the contract provides for this or not matters if it's a penalty, it's unenforceable. And I want to try and explain why it's so clearly a penalty under Illinois law. The first reason is that it doesn't distinguish, as they interpret it, between what caused the shortfall. So whether it's a Hancock discharge of payment or an Abbott discharge of payment, the penalty is the same. So in this case, for example, let's assume that Hancock contributed $214 million, full amount. Abbott failed to contribute its amount. It only contributed $300 million. So the shortfall would be $100 million, the penalty would be $33 million, and Hancock would get back that $33 million, and the ratio would be the same, 35%. That's fine. But if it's supplied where Hancock creates the shortfall, as they're trying to do here, they get the same $33 million, even though they spent $110 million less. So there's no accounting for the money that they saved by not having to make the payment. So immediately that runs into a prescription of Illinois that says, if your liquidated damage or performance alternative does not take into account cost savings that are being realized by the party that is getting that payment, then it's a penalty. But this goes beyond that. But the problem is we're not talking about a circumstance where Hancock's failure to complete its payments is caused by its breach or by any shortcoming on its part. It's been excused from payment under a separate clause of the contract. 3.3B and 3.4 are expressly made separate in the contract. I understood your argument, but the question is not whether there's a breach.  The question is whether the remedy is a penalty and, therefore, unenforceable under Illinois law. So that's what these arguments are directed towards. So I said to Ms. Lukey, there is a body of Seventh Circuit and Illinois law about what happens if the court considers it a close case. She rejoined to me that that body of law really shouldn't apply here because, in their view, it's an alternative enforcement clause. Yes, I think that's correct. Illinois law makes very clear that whether you call it alternative performance or liquidated damages, the question still is whether that performance is a penalty. And if it is, then the clause is unenforceable. No, you've missed my point. I think there's a body of law that says if the court thinks the question is very close, we can one way, not another way. Yes. You're arguing that it has to be a penalty clause. Suppose we just think the question is close? Well, I think, actually, the cases say close cases should be decided in favor of finding a penalty. We cite some of those cases in page 4 of the agreement. That is the point I've been trying to make. Yes. If we were to cite some of that authority, we would only have found additional authority for that proposition. Let me explain one more way in which the, and then I'll move to rescission, but one more way in which this is an egregious penalty clause. And that is that not only does it not distinguish between whether the shortfall was caused by Abbott or Hancock for purposes of determining whether this is a reasonable estimate of damages, so it doesn't take into account the cost savings, but it's the inverse, it goes in inverse proportion to the damages actually suffered by Hancock. Because the more that Hancock is excused from paying under the contract, the more that Abbott has to either contribute or pay as a loan for a penalty to Hancock. So for example, if Hancock had been excused in this case from all of its program payments of $214 million, then in the reading of section 3.B, Abbott would have to pay $71 million in payments instead of the 33. So even though Hancock is saving $214 million, they're getting 71. When they're saving $114 million, they're getting 33. So Illinois says that the clear indication of a penalty clause is when you have an inverse relationship in the so-called estimated damages between what the party is actually saving and what the party is gaining. And that's clearly present here. This one-third, when it applies to this situation, is totally arbitrary and has upside-down results that are penal. And that was why Judge Woodlock found that the clause was penal, and I think that's required under Illinois law. Do you want to talk about rescission, please? Excuse me? Rescission. Yes. So I think just going through the quick chronology of rescission shows the fact that the court not only did not abuse its discretion, but that it was clearly correct in filing rescission. Well, the thing that's bothering me about the rescission finding is I had thought that rescission would depend upon when the facts constituting fraud egregious enough to warrant rescission were reasonably known to Hancock. And the fact of the matter is that that discovery was going on for much of the period. leading up to the filing of this rescission claim. And the district court made no findings as to when those facts were or should have been known. Well, I think actually there's ample material in the record as to when they weren't known. I didn't say ample material. I said were there district court findings on that point? I think the court found, yes, that they knew, that Hancock knew it had a basis for rescission long before it ruled it on the contract claim, long before the complaint was amended. No, it reached the conclusion. Did it make any findings about when Hancock knew about this? Well, Hancock filed the complaint, in this case in June 2005, and it alleged fraud and misrepresentation in the complaint. And the judge cited that. That is an admission that they had a basis at that time to move for rescission. And he didn't find that. And in addition, they admitted any derogatory responses in the case. I can give you the record sites, that in June 2004, which was a year before they even filed this case, they knew that there was fraud and misrepresentation, they alleged, with respect to one of the compounds, ABT 518. That's the joint appendix 5731. In fall or winter of 2004, they've admitted in their interrogatory response that they had knowledge of material misrepresentations and alleged fraud with respect to other compounds. So Ms. Lukey, when I put the question to her, said, look, this is the very period when Hancock was trying to audit and your clients were stiffing Hancock, not giving it access. Yeah, but they did find, they did get documents in the audit that they claimed show this. And if the court looks at those, the second record sites. Independently of the audit. No, they got them from the audit. They're complaining about a number of things from the audit. It wasn't full, it wasn't complete. But they got information from the audit, which they've admitted in the interrogatory responses, told them that they knew of these material misrepresentations regarding all three of these compounds by the fall of 2004. That's the second site is JA5790. I think if the court looks at those record sites, you'll clearly see that they had that knowledge. And then they proceeded to file a claim for fraud and misrepresentation in June 2005. Now they're saying they didn't know about any of this until much later. But the record is clearly to the contrary and fully supports what the district court did. So then in June 2005, after filing this case, they proceeded for, through September 2005, they allowed Judge Woodlock to enter the contract judgment, affirming the contract, knowing they had a basis for rescission, alleging fraud in their complaint, saying they were reserving a right to rescission, so recognizing they had a basis for rescission, but they didn't want to assert it. In fact, they didn't assert it, coincidentally enough, until after this court, this court affirmed the district court on the contract, affirmed that they had a right not to make the payments, and a right to continue to receive the left of the contract. Then for the first time, one month later, not citing any new evidence of fraud or misrepresentation, all of a sudden they sought to amend their complaint for rescission. So I think when the court looks at the record, you will clearly see that they had knowledge of fraud and misrepresentations to all three compounds long before the amendment, long before the discovery they're talking about, and they waited strategically, they waited until they had the contract ruling in the bag, in their pockets, from the district court and this court, and then moved to rescind. And that's exactly the situation where you cannot advocate getting a 2, which is what they were trying to do. Thank you. Very quickly, first, with regard to the liquidated damages issue, under Illinois law we cite the case of River East Plaza LLC. A liquidated damages provision is perfectly enforceable if there's a value to both parties without a disproportionate windfall to one, because in that instance, it is not the, quote, sole purpose of the clause to secure performance, and it is therefore not a penalty. It is an alternative performance provision, and that is precisely what is asserted here. Abbott was required to spend another $99 million. Instead of doing that, it bought its way out with $33 million, even though it was the party in the wrong in misrepresenting facts to induce Hancock to enter this agreement. The provision is proportional. The less Abbott spends, the more Hancock recoups. Hancock doesn't have the choice of paying less. Its payments are specified. It can only avoid those payments if it is excused from performance by prior breach by Abbott. And that's what occurred. So if Hancock does not spend less, it is Abbott that controls that issue, and the less Abbott spends, the more Hancock recoups. That's appropriate. Should the innocent party be the one left without a remedy? Turning quickly to the rescission issue, we respectfully suggest to the court that the audit findings in Judge Woodlock's report or decision are very different from what was just stated here. He actually states that it wasn't even possible to perform a compliant audit. At every step of the way, Hancock made it clear that it was reserving its rights with regard to asserting rescission. It was trying to get evidence of intentional conduct via the audit. The audit was stonewalled. Therefore, the inability for Hancock to get the information its lawyer had hoped to have in hand was prevented by Abbott's own conduct. There's one wrongdoer in this case, only one. Abbott made the misrepresentations that caused this contract to go forward. Abbott is the one who stymied the audit that prevented an earlier amendment to assert rescission. Thank you. Thank you both.